IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

HENRY WAYNE RUSSELL, #230299,  )
                               )
        Petitioner,            )
                               )
v.                             )    NO. 3:23-cv-00053
                               )
SHAWN PHILLIPS,                )    JUDGE RICHARDSON
                               )
        Respondent.            )

**MEMORANDUM OPINION**

**I. Introduction**

In early 2023, state inmate Henry Wayne Russell filed a pro se Petition for a Writ of Habeas

Corpus pursuant to 28 U.S.C. § 2254 (Doc. No. 1) and paid the filing fee. (Doc. No. 6.) He

challenges his conviction by jury verdict and aggregate 30-year prison sentence in Davidson

County, Tennessee, on charges of rape. (Doc. No. 1 at 1.) After being directed to respond to the

Petition, Respondent filed the transcript of proceedings in state court (Doc. No. 12) and an Answer.

(Doc. No. 14.) Petitioner filed a Reply to the Answer. (Doc. No. 16.)

Upon review of these pleadings and the state-court record, the Court finds that an

evidentiary hearing is not required to resolve this matter, as "the record clearly indicates that the

petitioner's claims are either barred from review or without merit." *Stanford v. Parker*, 266 F.3d

442, 459 (6th Cir. 2001). As explained below, Petitioner is plainly not entitled to habeas relief, and

the Petition will therefore be denied.

## II. Procedural History

On August 3, 2007, Petitioner was indicted by the Davidson County Grand Jury on three counts of rape in violation of Tenn. Code Ann. § 39-13-503 and three counts of statutory rape by an authority figure in violation of Tenn. Code Ann. § 39-13-506. (Doc. No. 12-1 at 4–10.) Prior to trial, Petitioner filed a motion under Tennessee Rule of Evidence 412 (hereinafter, "TRE 412"), seeking the admission of evidence of the victim's reputation for, opinion of, and exposure to sexual conduct and behavior with individuals other than Petitioner, to challenge the credibility of the victim's allegations against him. (*Id.* at 38–39.) A hearing was held, and the TRE 412 motion was ultimately denied. (*Id.* at 49, 66–70.) Petitioner's motion to reconsider that determination was also denied. (*Id.* at 88–90.) Petitioner's counsel subsequently withdrew from the representation due to a conflict of interest, and new counsel was appointed. (*Id.* at 91–96.)

Petitioner's new lawyer, Manuel B. Russ, filed a motion in limine seeking permission to cross-examine the victim concerning her prior sexual conduct with respect to the charges of statutory rape by an authority figure (*id.* at 114–15), a charge to which TRE 412 does not apply. The motion was argued at a pre-trial hearing and denied from the bench. (Doc. No. 12-8 at 12–18.)

The case came to trial in August of 2012, and Petitioner was convicted as charged. (Doc. No. 12-1 at 125.) The trial court merged the three convictions of statutory rape by an authority figure with the corresponding rape convictions. (Doc. No. 12-6 at 12.) Petitioner was subsequently sentenced to an effective 30-year term of confinement, to be served consecutively to a 10-year federal sentence he was then serving for unrelated crimes. (*Id.* at 13–30); *see USA v. Russell*, No. 5:08-cr-00469-OLG-1, Doc. No. 53 (W.D. Tex. Mar. 17, 2010). Trial counsel filed a motion for new trial (Doc. No. 12-1 at 135–36), which was denied. (*Id.* at 137, 138.)

Petitioner appealed to the Tennessee Court of Criminal Appeals (TCCA), which affirmed his conviction and sentence. *State v. Russell*, No. M2013-00166-CCA-R3CD, 2014 WL 1704953 (Tenn. Crim. App. Apr. 29, 2014). The TCCA affirmed despite finding that the trial court erred in applying TRE 412 to the offense of statutory rape by an authority figure, because it found the error to be harmless. *Id.* at *17–18. The Tennessee Supreme Court denied permission to appeal. (Doc. No. 12-14.)

Petitioner then filed a pro se petition for post-conviction review. The trial court appointed new counsel (Doc. No. 12-15 at 71) who filed an amended petition. (*Id.* at 72–81.) The trial court held an evidentiary hearing (Doc. No. 12–16) and denied post-conviction relief. (Doc. No. 12-15 at 85–89.) Petitioner appealed the denial of post-conviction relief, raising a single issue of ineffective assistance of trial counsel: that counsel failed to conduct effective plea negotiations. (Doc. No. 12-18.) The TCCA affirmed the denial of post-conviction relief, *Russell v. State*, No. M2021-00774-CCA-R3-PC, 2022 WL 2277160 (Tenn. Crim. App. June 23, 2022), and the Tennessee Supreme Court denied review. (Doc. No. 12-23.)

Petitioner then filed this federal habeas action.

### III. Claims of the Petition

The Petition raises two claims:

(1) that "[t]he state courts' ruling denying Petitioner's request to introduce evidence pursuant to Rule 412 resulted in a decision that was contrary to, or involved an unreasonable application of clearly established Federal law, as determined by the Supreme Court of the United States"; and

(2) that Petitioner received ineffective assistance of counsel at trial and on direct appeal, when counsel (a) failed to properly argue for the admissibility of TRE 412 evidence, (b) failed to

assert Petitioner's right to a speedy trial, (c) failed to negotiate a plea agreement, (d) failed to challenge the sufficiency of the convicting evidence of rape on direct appeal, and (e) failed to renew the TRE 412 motion during trial when the State opened the door regarding the victim's knowledge of and consent to sexual activity.

(Doc. No. 1-1 at 2, 3–24.)

The court will address these claims following a review of the facts relevant to them.

## IV. Relevant Facts

The following statement of facts is taken from the TCCA's decisions on direct and post-conviction appeal. First, the evidence from Petitioner's 2012 trial, as summarized on direct appeal:

> [The minor victim] C.L. testified that she was born in October 1992, and she began living with her foster mother when she was nine years old. They lived at two different residences in Nashville. At some point, C.L.'s foster mother began dating Defendant, and he would sometimes spend the night at the foster mother's residence. C.L. was twelve years old when she first met Defendant. C.L. testified that she considered Defendant an "authority figure" over her because when her foster mother was not present "or just if we was all out somewhere and [Defendant] told me to do something, I was expected to do it."

> From the evening of February 22, 2007, until the morning of February 23, 2007, C.L.'s foster mother left Defendant in charge of her two sons and C.L., who was fourteen at the time, while the foster mother went to work. C.L. testified:

>> [The foster mother] had left the house and I had—me and her two sons were sharing a room, and I was asleep. And then [Defendant] came into my room and he woke me up, and he led me into [the foster mother's] bedroom.

>> And he told me to take off my clothes. And I stood there for a minute. And then he told me to take off my clothes again. And I took off my clothes. And then he sat on the bed and unbuttoned his pants and unzipped his pants.

>> Then he told me to perform oral sex on him. I said no. And he told me again, and so I did it. And after that, he told me to lay on top of him, and he performed oral sex on me while I performed oral sex on him.

C.L. testified that Defendant's tongue and fingers touched her vagina. She said that this continued for three to five minutes until Defendant's cell phone rang. When Defendant answered the phone, C.L. gathered her clothes and left the room.

C.L. testified that on the morning of February 23, 2007, her foster mother arrived home from work and questioned her about whether anyone had touched her in an inappropriate manner. C.L. told her foster mother that Defendant had made her perform oral sex on him. C.L.'s foster mother then asked her the color of Defendant's boxer shorts. After C.L.'s foster mother confronted Defendant, she asked C.L. to come into the room and repeat to Defendant what she said had happened. Defendant claimed that C.L. was lying and "didn't know what [she] was talking about." C.L. testified that approximately five minutes later, her foster mother took her to Our Kids Clinic for an examination. She had not showered or bathed from the time of the sexual activity until the examination. C.L. testified that the individuals at the clinic questioned her about what happened. C.L. said that she was sent to another foster home after she left the clinic. She was later interviewed on two occasions by a man and a woman. C.L. initially told them that the sexual activity with Defendant occurred one time. She eventually told them about other incidents.

C.L. testified that sexual activity occurred with Defendant on three other occasions prior to the night of February 22–23, 2007. She said that the first instance occurred at her foster mother's home on Murfreesboro Road. C.L. testified:

> [Defendant] came into my room. The boys were outside playing, and I was in a room watching TV. And [Defendant] told me to come here. And he pulled out his private part and he told me to get on my knees and perform oral sex on him.

C.L. indicated that she did not want to perform oral sex on Defendant; however, he told her that she would be taken away from her foster mother if she did not perform the act. C.L. then performed oral sex on Defendant while he stood in the doorway with his hand on the back of her head pushing it down. She said that she performed oral sex on Defendant until he ejaculated.

C.L. testified that the second time sexual activity occurred with Defendant was when Defendant picked her up after school. He was supposed to take her home but they drove to the Taco Bell near Hickory Hollow Mall to get some food. C.L. testified that after receiving the food, Defendant pulled around to the parking lot of the Taco Bell and told her to give him oral sex. C.L. refused but Defendant again told her to perform oral sex on him, and C.L. complied. C.L. testified that she performed oral sex on Defendant for approximately three minutes. He was in the driver's seat of the truck, and C.L. was in the passenger's seat. C.L. testified that Defendant's pants were unbuttoned and unzipped, and he had one hand on the back of C.L.'s head pushing it down while she was performing oral sex on him.

C.L. later told the daughter of her foster mother's friend that she did not like Defendant. When the girl asked why, C.L. responded: "Because he makes me give him head." The girl told C.L. that they should tell someone what happened. However C.L. testified that she told the girl that she would get in trouble and be taken away from her foster mother. The girl agreed not to say anything until C.L. was ready to reveal the information.

C.L. testified that the third incident of sexual contact with Defendant occurred at the home Defendant shared with his sister. C.L. had spent the night at the residence with Defendant's niece. C.L. testified that as she walked out of the shower and into the room to get dressed, Defendant opened the door and asked what she was doing. She told Defendant that she was getting dressed, and he then told her to give him oral sex. C.L. testified that she said, "I don't like doing this[,]" and Defendant said, "It won't take that long." She then performed oral sex on Defendant, and he ejaculated into the towel that she had been using and left the room. C.L. again testified that while she was performing oral sex on Defendant, he had his hand on the back of her head pushing it down. She said that at the time, everyone else in the residence was downstairs.

C.L. testified that she never engaged in any sexual activities with Defendant while he was sleeping, and she never approached him in a sexual manner.

C.L.'s foster mother testified that C.L. began living with her when C.L. was ten years old, and she remained C.L.'s foster mother for approximately four years. Prior to the time of the offenses, she had planned to adopt C.L. C.L.'s foster mother testified that she met Defendant in 2002, and they began dating shortly thereafter. Their relationship lasted for four or five years. C.L.'s foster mother testified that C.L. met Defendant approximately a year and a half after the foster mother began dating Defendant. C.L. and Defendant seemed to have a good and appropriate relationship. C.L.'s foster mother did not notice any conflicts between the two. She said that Defendant spent at least one night a week at her residence.

C.L.'s foster mother testified that on the night of February 22, 2007, until the morning of February 23, 2007, she was working for a home health company caring for an elderly patient. She also worked full time for CarMax. C.L.'s foster mother testified that when she worked at night for the home health company, her mother usually cared for C.L. and the foster mother's two other children. When her mother could not care for the children, Defendant would stay with them at night. The foster mother did not consider Defendant to be C.L.'s caretaker or supervisor when the foster mother was around.

C.L.'s foster mother testified that Defendant picked C.L. up from a hair appointment on one occasion in Hermitage. She said that it took a while for Defendant and C.L. to return home, so she called Defendant and asked where they were. Defendant indicated that C.L. had gone to Taco Bell with him. C.L.'s foster

mother testified that Defendant and C.L. arrived home approximately fifteen to twenty minutes later with food from Taco Bell.

C.L.'s foster mother testified that on February 22, 2007, she left for the home health job at approximately 10:30 p.m. Her two children were asleep, and C.L. was almost asleep. C.L.'s foster mother testified that there were no adults present at the residence when she left and that Defendant was supposed to arrived [sic] later to stay the night with them. She thought that he arrived at the house at approximately 3:00 a.m. on February 23, 2007, because she spoke with him by cell phone. C.L.'s foster mother testified that she had been calling Defendant "all night" because she wanted someone there with the children, but she had not received any response.

C.L.'s foster mother testified that during the time that she was trying to reach Defendant, she had a conversation with Keela Hatchett concerning C.L. During the conversation with Ms. Hatchett, C.L.'s foster mother received some information that caused her to question C.L. the following morning when the foster mother arrived home between 7:00 and 7:15 a.m. C.L.'s foster mother testified that she asked C.L. if "anything had been going on that shouldn't be with an adult." C.L. replied, "No." C.L.'s foster mother continued to question her about the matter until C.L. said, "Yes." C.L. then told her that Defendant had "licked" her. C.L.'s foster mother assumed Defendant had licked C.L. in her private area. She asked C.L. if she had urinated or washed since Defendant licked her, and C.L. said, "No." C.L.'s foster mother told her to put some clothes over her pajamas so that she could be taken to a hospital.

While C.L. was getting dressed, C.L.'s foster mother walked down the hall to her bedroom where Defendant was sleeping and told him what C.L. had disclosed to her. Concerning Defendant's response, the foster mother testified:

> He was, like, "What?" He was confused. And he was, like "Okay." He got up and went to the restroom and he had his clothes on and he came out. And then he asked [C.L.] why she said that or whatever. And then he said, "Don't you know that we can go to jail? We can all go to jail?" or something like that or "I can go to jail," or something like that.

C.L.'s foster mother testified that Defendant denied any sexual activity with C.L. and said that she was lying. However, Defendant later told her that C.L. "come [sic] on to him" and that "he had licked his fingers and began fondling [C.L.'s] vagina because she was dry[.]"

C.L.'s foster mother called C.L.'s mentor with the Department of Children's Services (DCS), who told the foster mother to take C.L. to Our Kids Clinic. C.L.'s foster mother had also asked Defendant to go to the clinic for his mouth to be swabbed to prove his innocence. Defendant then drove to the clinic separately and arrived shortly after C.L. and her foster mother. C.L.'s foster mother testified that on the drive to the clinic, C.L. told her that she and Defendant had "69'd," which

to the foster mother implied that Defendant and C.L. were performing oral sex on each other at the same time. C.L.'s foster mother noted that Defendant was fond of the "69" position. After they arrived at the clinic, C.L.'s foster mother informed the staff that Defendant had licked C.L., who was then examined.

C.L.'s foster mother testified that C.L. immediately went to another foster home after the examination. The decision was made by C.L.'s foster mother and the DCS worker. C.L.'s foster mother testified that C.L. had spent the night at the home of Defendant's sister on two or more occasions. She noted that C.L. told her that Defendant had made statements to her that if she told about the sexual abuse, she would lose her foster mother.

C.L.'s foster mother testified that she was later contacted by Detective David Zoccola with the Metropolitan Nashville Police Department. She told him that C.L. indicated that Defendant had asked C.L. to perform oral sex on him. C.L.'s foster mother testified that she continued her relationship with Defendant for approximately one year after the allegations. She identified phone records from Defendant's cell phone number which reflected calls placed between her and Defendant from February 22, 2007, until the early morning hours of February 23, 2007. One of the calls was answered at 2:59 a.m. on February 23, 2007. Prior to that call, all of the calls to Defendant went unanswered or to his voice mail. When C.L.'s foster mother spoke to Defendant at 2:59 a.m., he sounded inebriated. She asked Defendant what time he arrived at her residence, and Defendant indicated that he had just arrived. He also said that the children were asleep.

C.L.'s foster mother testified that she had not witnessed any conflict between C.L. and Defendant, and C.L. had never seemed jealous of her relationship with Defendant. C.L.'s foster mother said that she never indicated to C.L. that she would not adopt C.L. if the foster mother continued her relationship with Defendant.

On cross-examination, C.L.'s foster mother testified that the phone records also documented four telephone calls between her and Defendant between the hours of 2:00 a.m. and 3:00 a.m. in addition to the call at 2:59 a.m. She also agreed that the call at 2:59 a.m. was from Defendant. C.L.'s foster mother testified that Defendant eventually told her that there was sexual contact between him and C.L. and that C.L. initiated the contact. She admitted that she did not consider C.L. to be a truthful person, and DCS, police, and the district attorney's office were aware of her opinion. C.L.'s foster mother did not recall Defendant ever being asked to pick up C.L. from school. She said that when C.L. stayed overnight at Defendant's sister's house, Defendant was not living there at the time.

C.L.'s foster mother was not aware of any occasion that C.L. went to Hickory Hollow Mall with Defendant, and she thought that they stopped at the Taco Bell on Murfreesboro Road the day that he picked her up in Hermitage from a hair appointment. She testified that while C.L. was living with her, C.L. had problems with "lying, fabricating stories." She also had "a lot of emotional and attachment

issues." C.L.'s foster mother testified that C.L. was not on medication at the time but had "lots of therapy and counseling."

Lisa Dupree, a forensic social worker at the Our Kids Center in Nashville General Hospital, testified that C.L. was examined at the center on February 23, 2007. C.L. reported to Lorraine Gray, who was no longer employed at the center at the time of trial, that Defendant had put his mouth on her "private parts." C.L. indicated that Defendant had "swiped his hands by her genital area, but did not touch in her genital area with his hands[.]" Ms. Dupree testified that C.L. also said that approximately two months earlier, Defendant asked her to put her mouth on his private parts. C.L. then disclosed the conduct to the daughter of her foster mother's friend. Ms. Dupree testified that C.L. indicated that her last menstrual cycle ended two days prior to the exam. There was some blood noted during the physical exam. Ms. Gray also documented that C.L. indicated that Defendant told C.L., "Don't do this, you don't want to leave don't go telling nobody this, you'll have to leave[.]"

Holly Gallion, a nurse practitioner with Our Kids Center, testified that she conducted a medical examination of C.L. in February of 2007. According to the report, the sexual contact between Defendant and C.L. occurred at approximately 3:00 a.m. She examined C.L. within five to six hours of that contact. Since there were allegation of oral sex, Ms. Gallion collected a rape kit from C.L. that consisted of swabs of C.L.'s genital area "to look for specifically saliva oral secretions." Ms. Gallion testified that she based her examination on information that Ms. Gray obtained from C.L. She noted that C.L. had described having her period a few days earlier, and Ms. Gallion noticed a little bit of bleeding. She determined that a "scant" amount of blood was coming from C.L.'s cervix, but there was no internal trauma. Ms. Gallion described C.L.'s physical examination as normal and that the exam neither confirmed nor denied the possibility of any type of sexual contact. However, given the history provided by C.L. Ms. Gallion did not expect to see any type of physical evidence to confirm the sexual assault.

Special Agent Charles Hardy, a forensic scientist with the Tennessee Bureau of Investigation (TBI) assigned to the serology and DNA unit, testified that he analyzed evidence from the rape kit collected from C.L. The results of the swabs from C.L.'s vaginal area "revealed the presence of alpha-amylase, which indicates the presence of saliva." The DNA profile that he obtained from the swabs matched that of C.L. Special Agent Hardy noted that the swab could have contained C.L.'s skin cells, which could account for the finding of C.L.'s DNA profile.

Detective David Zoccola of the Metropolitan Nashville Police Department was assigned to investigate C.L.'s case through a DCS referral from Peggy Nunn. He testified that an interview of C.L. was conducted on February 28, 2007, with Latoya Clark, a forensic interviewer from the Child Advocacy Center. Detective Zoccola was not present for the interview but it was recorded. Concerning the interview Detective Zoccola testified:

> I would have been furnished with a copy of that interview where the child disclosed whatever information there was to disclose. And then I would have been furnished with either verbally what happened at that first interview and then eventually would have gotten a typed copy and a DVD or tape of that interview. It would have involved me talking to [C.L.'s] foster mom and then starting the process of investigating the allegations.

Detective Zoccola testified that he interviewed Defendant on March 9, 2007, at Defendant's place of business, a barbershop located at 8th Avenue and Wedgewood in Nashville. He said that Defendant agreed to talk with him, and the interview was recorded. Defendant was aware of the allegations made by C.L., and Detective Zoccola explained to him exactly what C.L. alleged had occurred on February 22–23, 2007. In the recording Defendant explained his relationship with C.L. He said that they got along well, and he never disciplined her. Defendant told Detective Zoccola that C.L. considered him to be an authority figure, someone that she would talk to when in trouble, and someone that she would confide in. Defendant also referred to himself as "a friend, a father figure, someone in an authoritative position."

In the interview, Defendant initially said that he did not touch C.L. After speaking with Detective Zoccola for more than an hour, Defendant maintained that C.L.'s allegations were false and that he was not guilty of "any type of sexual advancement towards her." When Detective Zoccola asked if C.L. had made any sexual advancement toward him, Defendant without hesitation replied, "Yes."

Defendant told Detective Zoccola that on the night of February 22–23, 2007, he stopped at a Jack–in–the–Box before going to C.L.'s foster mother's house. He ate the food, and then went to bed. Defendant said that he had been drinking and became sick. He went to the bathroom and vomited and then went into the kitchen to get some water to rinse his mouth. Defendant claimed that he went back to bed and woke up sometime later to find C.L. performing oral sex on him. At first, Defendant thought that he was dreaming, but when he realized what was happening, he told C.L. to go back to her room. Defendant said that when he asked C.L. what she was doing, "she just kind of shrugged her shoulders, like nonchalant." Defendant admitted that he was intoxicated that night.

Defendant said that the contact with C.L. occurred only one time. Later in the interview he explained that when he woke up C.L. was not wearing any clothes. When Detective Zoccola asked Defendant what he was wearing and whether C.L. had to remove or manipulate his underwear to access his penis Defendant said that he was wearing his boxer shorts. When questioned again about what C.L. was wearing Defendant said that "[s]he had on-she might have had on a shirt, but she-once again, I told you when I had touched her person[ ], being her vaginal area, that's when I really came to, and it was like, this is more vivid than what it really is-is this is not a dream." When Detective Zoccola repeatedly told Defendant that he needed to tell everything that happened, Defendant responded:

> Once I had laid down to go to sleep, like I said, she, uh—whenever time
> she came in there, you know, I was, in the dream I was having oral sex—
> um, I was receiving oral sex, and—I went to touch her, but noticed that it
> was dry, so, being that it was dry, I did one of those common things that
> either a man or a woman would do, and basically, I took and—basically, I
> did like that, [licked his hand] and I touched her, and when I—that's when
> I really just awoke, and was like, hold up—what's going on.

Defendant told Detective Zoccola that there was no further talking, kissing, fondling, or removal of each other's clothing, or any other sexual contact between him and C.L. Detective Zoccola later spoke with Defendant about giving a DNA sample to compare to anything found on the swabs taken from C.L.'s body. He informed Defendant that he did not have to give the samples and that he was free to speak with an attorney before giving them. Detective Zoccola also explained how the swabs from C.L.'s vaginal area might show the presence of Defendant's saliva. Defendant replied, "But then—I know—I know I didn't stick my fingers in her, but me touching my mouth and touching her vagina—that can transfer saliva right there."

Based on some discrepancies between C.L.'s interview and Defendant's interview, Detective Zoccola interviewed C.L. on March 14, 2007. Peggy Nunn from DCS was also present when he interviewed C.L. at the Child Advocacy Center. Initially, Ms. Nunn interviewed C.L. alone and emphasized the need for C.L. to be honest with her. When asked if the sexual abuse had occurred on any previous occasions, C.L. said that the incident on February 22–23, 2007, was "the first time." Ms. Nunn then asked C.L. if anything had "ever been going on that led up to this," C.L. replied, "Well, not really, but one time before he asked me to put my mouth on his private part, but I didn't do it."

Ms. Nunn then asked C.L. again about the incident that occurred on February 22–23, 2007. C.L. told Ms. Nunn that the incident occurred at approximately 3:00 a.m. She was in the bedroom asleep with her foster brothers when Defendant walked in and told her to "come here." C.L. said that Defendant took her into the other bedroom and told her to lie down. He then removed her pants and underwear and placed his mouth on her "private part." C.L. said that she tried to scoot back, but every time she did so, Defendant pulled her closer. Defendant instructed her to stop scooting back, and then his phone began ringing. C.L. said that Defendant did not answer until the third time that the phone rang. C.L. then picked up her clothes and left. C.L. told Ms. Nunn, "And he was like, where you going?" Then C.L. told him that she was going back to her room, Defendant "was like, man, just forget you. Go on."

C.L. eventually told Ms. Nunn that Defendant asked her if she wanted to "sixty-nine?" C.L. said that she asked Defendant what the term meant, and he told her that it was when a girl and a boy perform oral sex on each other at the same time. Ms.

Nunn told C.L. that Detective Zoccola had interviewed Defendant and that his story was different than hers. When asked again if any sexual behavior had previously occurred with Defendant, C.L. responded, "Not that I can remember." When asked what she thought Defendant would say, C.L. said that Defendant would say that she came on to him in order to keep himself out of trouble.

Detective Zoccola then joined Ms. Nunn and C.L. in the interview room and asked if C.L. had any questions for him. C.L. asked if Defendant "admitted to doing it." Detective Zoccola then told C.L. that Defendant had told him about a different kind of activity, and he told C.L. that he could not help her unless she was completely honest with him. He told C.L. that Defendant claimed that she came into the bedroom and performed oral sex on him while he was sleeping. However, C.L. insisted that Defendant was untruthful and that he had asked her previously to perform oral sex on him but she refused. C.L. told Detective Zoccola that the request occurred at Defendant's house one day after he had picked her up from school while she was waiting for her foster mother to pick her up. C.L. denied performing oral sex on anyone. Detective Zoccola explained to C.L. that there were problems with her case because things were so different, and he could not understand why Defendant admitted to the different sexual activity when it would still get him into trouble. C.L. insisted that although Defendant asked her to "sixty-nine" with him, she did not comply.

Detective Zoccola again told C.L. that he wanted her to be one-hundred percent honest and to tell the truth. C.L. then asked to speak with Detective Zoccola alone. She told him that on the night of February 22–23, 2007, Defendant walked into her bedroom where she and her foster brothers were sleeping and woke her up. He took her into the other bedroom, placed her on the bed, and over her objections, began to perform oral sex on her. C.L. said that Defendant's cell phone rang, and he stopped to look at it but did not answer. He continued performing oral sex on C.L. and the phone rang again. Defendant looked at the phone but did not answer and returned his attention to C.L. C.L. told Detective Zoccola that when she resisted Defendant, he forced her to perform oral sex on him as she sat on the edge of the bed. When the cell phone rang a third time, Defendant answered. C.L. then picked up her clothes and returned to her room.

Detective Zoccola told C.L. that if she performed oral sex on Defendant any other times, then she should tell him. C.L. finally said, "It has happened." When asked how many times she had performed oral sex on Defendant, C.L. replied, "Three." C.L. told Detective Zoccola that the first incident occurred near the beginning of the school year in 2006 at her foster mother's house while her foster mother was at work. She had just gotten out of the shower and Defendant was waiting in her room. C.L. said that Defendant told her to "come here," and he forced her to perform oral sex on him as he touched her chest. The second incident occurred during the second semester of school in Defendant's truck in the parking lot at the Hickory Hollow Mall. C.L. said that Defendant asked her to "do it," and she said no, but when he

told her again to "do it," she complied. Defendant then drove her home. A third incident occurred at Defendant's house after Christmas break in January of 2007.

Tekiyah Cooper testified on behalf of Defendant. She previously dated Defendant, and she remained in contact with his mother. She also spoke with Defendant during his incarceration in Kentucky. Ms. Cooper testified that she was also familiar with C.L. through Ms. Cooper's employment with Corrections Corporation of America at the minimum security jail in Nashville. Ms. Cooper testified that she met the victim when C.L. was an inmate in the "female building" under Ms. Cooper's supervision. She and C.L. would have in-depth conversations while C.L. was incarcerated. Concerning C.L.'s character for truthfulness, Ms. Cooper testified:

> I believe that in the beginning she wasn't as truthful with me, because she didn't know me. But once she got to know that I required the truth, she would be more truthful with me. So, in the beginning if she lied to me she would receive sanctions. But, after that once she got to know who I am and how I like things, if I asked her a question I believe she will tell me the truth.

Patricia Terrell testified that she was employed as a guidance counselor at the Margaret Allen Middle School in 2006–2007. C.L. was one of her former students. Ms. Terrell testified that she interacted with C.L. on an "as-need basis." She estimated that she spoke with C.L. at least fifteen to twenty times. Concerning C.L.'s character for truthfulness, Ms. Terrell testified:

> Well, I had incidents—it was some incidents where there was some truth not told; whether it would be a parent conference, I believe, I had with the guardian at the time, regarding, you know, work ethic, or different things like that, or just general things—a trip, I believe, she told me she took that she did not take. So, it was things like that.

*State v. Russell*, 2014 WL 1704953, at *1–10.

Nearly three years prior to trial, in December 2009, the hearing under TRE 412 was held. Petitioner's prior counsel put on three witnesses in support of his motion to establish the admissibility of evidence of L.C.'s prior sexual behavior. (*See* Doc. No. 12-3, Hearing Transcript.)

The following testimony was elicited:

> …Marcie Austin testified that she previously owned a company called Realistic Interventions and had twenty-one years of psychology and counseling experience. Although she was not licensed, Ms. Austin was qualified as an expert in the field of children's sexual issues. Ms. Austin testified that her company provided "in-home interventions, such as stabilization and privacy situations, preservation

services, reunification services, adoption studies, home studies, supervised therapeutic visits, parenting assessments. Just a number of things." Ms. Austin testified that she worked closely with the Department of Children's Services (DCS), and she began working with C.L. when C.L. was nine or ten years old and worked with her for an approximate total of seven years. She said that C.L. came in for "therapeutic, supervised therapeutic visits with her maternal grandmother [.]" Ms. Austin specifically noted that she did not conduct any psychological tests with C.L. Concerning her observations of C.L., Ms. Austin testified that supervised therapeutic visits with C.L. stopped because C.L.'s maternal grandmother decided that she did not want to follow through with the visits. After C.L. began living with her foster mother, Ms. Austin followed her as a "mentor" for a year. Ms. Austin testified that C.L. had a history of abuse and neglect by her family members. Concerning C.L.'s behavior, Ms. Austin testified:

> Within the first week of knowing [C.L.], [she] was placed at [the foster mother's] house, her first foster home, she was witnessed humping her body on [a] neighborhood boy. From that point on there [were] constant issues with her at school doing inappropriate things, sexually and behaviorally. This has gone on, and on, and on. There is a very strong history of—it comes to a point where I realized, in working with her, the best I could do was try to help, kind of, restructure her thinking of what she was trying to function on behaviorally from what she (unintelligible) because it is very difficult to get the truth out of [C.L.]. And I'm sorry [C.L.] (unintelligible) I will say that on a personal level I love her as a child dearly, but I will say I cannot believe anything that comes out of her mouth. She is the first child in my twenty-one years that I've worked with that I would say that about. So I cannot be a good witness to the court to prosecute anyone that has been alleged to do anything to her because of the very strong history, and the acting out, and the familial history, too. [C.L.] needs help. She's going to need help for many, many years. I don't know that [C.L.] will ever function totally appropriately as an adult[ ], what we consider appropriately in society.

On cross-examination, Ms. Austin testified that the "humping" of little boys by C.L. occurred when C.L. was nine or ten years old. The allegations involving the present case occurred when C.L. was fourteen years old. Ms. Austin testified that she had no particular knowledge or information of any sexual behavior involving C.L. that occurred within a seventy-two hour time frame on February 23, 2007. However, Ms. Austin noted that C.L. dressed provocatively at nine or ten years old and that she had "absolutely no boundaries physically or mentally." Ms. Austin testified that other teenagers told her that C.L. had sex "with boys in the bathrooms and stuff at school" when she was fourteen to fifteen years old. She said that C.L. had been physically abused in one of her foster homes. Ms. Austin felt that C.L. should be tested for "sociopathic behaviors," and she said that it was very difficult for C.L. to tell the truth.

On redirect examination, Ms. Austin testified to the following concerning prior incidents of sexual behavior by C.L.:

> Dressing provocatively; approaching men in inappropriate manners, which means, like, taking your body and touching them, not necessarily humping them in front of me, but no boundaries. Like, you would be a man standing there, and her come up and be as close to you as that she's touching your knee and your leg. Putting her hands on your chest your hair, and, you know, sexual acting out playfully that's very—could be considered, you know, iffy-like if the person didn't know her, if that makes sense. But by the trained professional you know that that's not appropriate behavio[ ]r.

Kisha Cox, Assistant Principal at I.T. Creswell, Arts Magnet Middle School, testified that she met C.L. when Ms. Cox was a sixth grade teacher at Wharton Middle School. Concerning C.L.'s behavior at school, Ms. Cox testified:

> The first incident, that I can remember, I caught [C.L.] in the second floor restroom, tongue kissing another male student. And I, also, contacted [C.L.'s foster mother] when this incident occurred. This is when she was a sixth grader.

> Another incident is, one day I was sitting at my desk—and I always kept [C.L.] in close proximity of me because of her promiscuous behavior.

> * * *

> And so I was sitting at my desk and she was talking about the genitalia areas of her foster mother's oldest son. And I, kind of, eavesdropped and listened to the conversation. And she said she had saw him in the restroom and he had a big genitalia area. And so, after I heard it, I asked [C.L.], you know, "Why are you having these conversations in the classroom?" And she didn't see anything wrong with those types of conversations.

Ms. Cox noted that C.L. would frequently "present herself in a sexual manner to the young men" in Ms. Cox's classroom. Parents called Ms. Cox and asked her to keep C.L. away from their child. Concerning C.L.'s truthfulness, Ms. Cox testified:

> I observed, in our—my personal conversations with [C.L.], [C.L.] was not truthful about the incidents that I even witnessed with my own eyes. She had a way of being creative with the truth. Even if you saw her commit the act with your own eyes she had a way of painting a totally different picture in which you saw [sic]. And so, therefore, it was like pulling teeth to get the truth out of [C.L.]. And only when I called [C.L.'s foster mother] is when the truth would start surfacing, slowly but surely. But it was a task

getting the truth out [of] her, even when I witnessed and heard these incidents.

Ms. Cox testified that all of the incidents occurred before February 23, 2007, when C.L. was twelve years old and in the sixth grade.

On cross-examination, Ms. Cox testified that C.L. initiated the incident of french kissing with a boy in the bathroom. She said that the boy did not like it and reported the incident to her. C.L. told Ms. Cox that she liked the boy and wanted to kiss him. Ms. Cox testified that C.L. had never reported that she had been raped or sexually molested. She agreed that sexual behavior among girls thirteen and fourteen years old was not unusual. Ms. Cox testified that C.L. had a "wide knowledge of sexual activities" at the age of twelve.

C.L.'s foster mother testified that she became C.L.'s foster parent on April 17, 2003. Concerning C.L.'s sexual behavior, C.L.'s foster mother testified that C.L. saw her youngest son when he was approximately three years old in the bathroom. C.L. then went to school and talked about "how big his penis was and how he was all hard[.]" The foster mother also caught C.L. putting a tattoo on her friend's bottom. C.L.'s foster mother testified that while C.L. was attending St. Vincent de Paul Catholic School, she told the foster mother that her grandmother had raped her. C.L. was approximately ten years old at the time. She also told other children at school about the incident. C.L.'s foster mother testified:

> She told me that she and her grandmother were laying in the bed, and—she said she don't [sic] sleep in panties, so her grandmother was rubbing on her [private area]. And the only thing that stopped her from doing it was someone knocked on her door.

C.L.'s foster mother testified that she was called to St. Vincent's School for an emergency meeting with the principal and two other parents in August of 2003. The individuals were concerned because C.L. was "telling them that she had been raped over the summer and that she had come on her period." She said that the other parents wanted to remove their children from the school because they were concerned that C.L. was "a little more [sexually] advanced than their children." C.L.'s foster mother later learned that C.L. was not truthful about being raped. She testified that on one occasion, she saw C.L. at a friend's house "all crawled up on" an older man that C.L. did not know. C.L.'s foster mother also said that C.L. had an old cell phone that she had been pretending to talk on for two days while at the friend's house, and she made the phone ring. The phone was dead when the foster mother took possession of it.

On cross-examination, C.L.'s foster mother testified that she had no knowledge of C.L. being involved in any type of sexual activity within seventy-two hours of the incident with Defendant.

*State v. Russell*, 2014 WL 1704953, at *14–16.

Following the conclusion of direct appellate review, Petitioner sought and was denied post-conviction relief. In deciding his appeal from that denial, the TCCA provided the following summary of the evidence from Petitioner's post-conviction evidentiary hearing:

> At the evidentiary hearing, the petitioner testified that he was represented by another attorney when the charges were first levied in this case in 2007 and that trial counsel took over his case in 2011. The petitioner said that he did not meet with trial counsel at any point from the time trial counsel was assigned to his case until the trial. He claimed that he met with trial counsel's investigator one time and maintained that he did not ever speak with either the investigator or trial counsel himself at any court date "other than trial." The petitioner said that trial counsel did not review the discovery materials with him but acknowledged that his first attorney had provided him with a copy of the discovery materials. He also admitted that he had reviewed the victim's recorded statements with his first attorney. The petitioner said that he "was really unsure" what trial strategy trial counsel intended to employ. The petitioner testified that the State made plea offers while he was represented by his first attorney and that that attorney had "said he would reserve the right for us to go back and explore it." The petitioner said that he told trial counsel "about a possible offer, and he said that he would get with the DA and ask them about it." The petitioner claimed that trial counsel told him that the State "would offer me [12] years, but I would do [18] months after getting released from federal custody" and that he told trial counsel that "I would consider taking it." The petitioner said that when trial counsel approached the State, however, "he said that they could no longer give me that plea because it was against Tennessee law." As a result, the petitioner had no opportunity to "accept the plea." At that point, "I figured it was over with. There was no offer that was going to be made, no negotiations."
>
> During cross-examination, the petitioner conceded that he was in federal custody until 2011, when he "was returned to state custody" and held in the Davidson County Jail. He admitted that trial counsel spoke with him in person at the jail two times "at most." The petitioner said that, if given the chance, he would have accepted the plea offer initially made by the State.
>
> Trial counsel testified that he began representing the petitioner "some time in 2011." Initially, most of their communication occurred by mail because the petitioner "was in federal custody and he was being housed in Yazoo City, Mississippi." With regard to plea negotiations, trial counsel recalled that "there had been an offer and it was either rejected or ... we deferred whether we were going to accept or not." Closer to the petitioner's trial, trial counsel approached the prosecutor about the offer, and the prosecutor told him "that the offer the State had made would create an illegal sentence." The issue was created by the fact that the petitioner was serving a federal sentence. Trial counsel explained that "[i]f the offer

went from being [12] years concurrent with his federal sentence to [12] years consecutive to his federal sentence, I don't think [the petitioner] was interested in accepting that offer." Trial counsel could not recall the petitioners asking him to make a counter offer to the State.

*Russell v. State*, 2022 WL 2277160, at *2.

# V. Analysis

A. <u>Legal Standard</u>

The statutory authority of federal courts to issue habeas corpus relief for persons in state custody is provided by 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). A federal court may grant habeas relief to a state prisoner "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Upon finding a constitutional error on habeas corpus review, a federal court may only grant relief if it finds that the error "had substantial and injurious effect or influence" upon the conviction. *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993); *Peterson v. Warren*, 311 F. App'x 798, 803–04 (6th Cir. 2009).

AEDPA was enacted "to reduce delays in the execution of state and federal criminal sentences, particularly in capital cases . . . and 'to further the principles of comity, finality, and federalism.'" *Woodford v. Garceau*, 538 U.S. 202, 206 (2003) (quoting *Williams v. Taylor*, 529 U.S. 362, 436 (2000)). AEDPA's requirements "create an independent, high standard to be met before a federal court may issue a writ of habeas corpus to set aside state-court rulings." *Uttecht v. Brown*, 551 U.S. 1, 10 (2007) (citations omitted). The Supreme Court recently explained this "high standard" as follows:

AEDPA sharply limits federal review of habeas claims raised by state prisoners. A federal court may grant habeas relief on a claim that a state court resolved on the merits only when the state court's "decision" was "contrary to, or involved an unreasonable application of, clearly established Federal law," or "was based on an unreasonable determination of the facts in light of the evidence presented" in state

court. 28 U.S.C. § 2254(d). These standards require federal courts to give the "benefit of the doubt" to merits decisions issued by the courts of the sovereign States. *Woodford v. Visciotti*, 537 U.S. 19, 24, 123 S. Ct. 357, 154 L.Ed.2d 279 (2002) (per curiam). AEDPA review provides an important but limited safeguard: It protects against "'extreme malfunctions'" in the state courts' adjudication of constitutional claims. *Harrington v. Richter*, 562 U.S. 86, 102, 131 S. Ct. 770, 178 L.Ed.2d 624 (2011). So in order to obtain federal habeas relief, a state prisoner must "show far more" than "'clear error.'" *Shinn v. Kayer*, 592 U.S. 111, 118, 141 S. Ct. 517, 208 L.Ed.2d 353 (2020) (per curiam) (quoting *Virginia v. LeBlanc*, 582 U.S. 91, 94, 137 S. Ct. 1726, 198 L.Ed.2d 186 (2017) (per curiam)). The habeas claimant must instead establish that the state court "blunder[ed] so badly that every fairminded jurist would disagree" with the decision. *Mays v. Hines*, 592 U.S. 385, 392, 141 S. Ct. 1145, 209 L.Ed.2d 265 (2021) (per curiam). Only then is a decision "so lacking in justification" that its error precludes even the "possibility for fairminded" dispute. *Richter*, 562 U.S. at 103, 131 S. Ct. 770.

"If this rule means anything," we have said, it means that a federal court must "carefully consider all the reasons and evidence supporting the state court's decision." *Mays*, 592 U.S. at 391, 141 S. Ct. 1145. That requirement is pivotal because federal courts have "no authority to impose mandatory opinion-writing standards on state courts." *Johnson v. Williams*, 568 U.S. 289, 300, 133 S. Ct. 1088, 185 L.Ed.2d 105 (2013). And a state court "need not make detailed findings addressing all the evidence before it." *Miller-El v. Cockrell*, 537 U.S. 322, 347, 123 S. Ct. 1029, 154 L.Ed.2d 931 (2003). Indeed, AEDPA requires deference even if the state court does not discuss the evidence at all. *Richter*, 562 U.S. at 99, 131 S. Ct. 770….

*Klein v. Martin*, No. 25–51, 2026 WL 189976, at *4 (U.S. Jan. 26, 2026).

A state court's decision is "contrary to" clearly established federal law under Section 2254(d)(1) "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412–13 (2000). An "unreasonable application" under this subsection occurs when "the state court identifies the correct legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413; *White v. Woodall*, 572 U.S. 415, 426 (2014). The standard here is objective unreasonableness, as determined by scrutinizing

the state court decision for whether it is "so lacking in justification" that no fairminded jurist could disagree that it was erroneous. *Harrington*, 562 U.S. at 103.

Similarly, a federal habeas court may not find a state court's factual determination to be unreasonable under Section 2254(d)(2) simply because it subjectively disagrees with the determination and therefore "would have reached a different conclusion in the first instance." *Wood v. Allen*, 558 U.S. 290, 301 (2010); *see Young v. Hofbauer*, 52 F. App'x 234, 237 (6th Cir. 2002). Rather, the determination must be "objectively unreasonable in light of the evidence presented in the state-court proceeding." *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003). This is "a daunting standard." *McMullan v. Booker*, 761 F.3d 662, 672 (6th Cir. 2014) (quoting *Taylor v. Maddox*, 366 F.3d 992, 1000 (9th Cir. 2004)). "If reasonable minds reviewing the record might disagree about the finding in question, on habeas review that does not suffice to supersede the trial court's . . . determination." *Brumfield v. Cain*, 576 U.S. 305, 314 (2015) (quoting *Wood*, 558 U.S. at 301) (internal quotation marks omitted). Moreover, a state court's factual determinations "shall be presumed to be correct" and the petitioner bears "the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); *see also Davis v. Ayala*, 576 U.S. 257, 271 (2015) ("State-court factual findings . . . are presumed correct; the petitioner has the burden of rebutting the presumption by 'clear and convincing evidence.'") (quoting *Rice v. Collins*, 546 U.S. 333, 338–39 (2006)). Finally, the petitioner may not prevail under Section 2254(d)(2) simply by showing that a fact was unreasonably determined; he "must show that the resulting state court decision was 'based on' that unreasonable determination." *Rice v. White*, 660 F.3d 242, 250 (6th Cir. 2011).

Review under AEDPA is not only demanding, but also ordinarily unavailable to state inmates who have not fully exhausted their remedies in the state court system. Sections 2254(b)

and (c) provide that, subject to certain exceptions, a federal court may not grant a writ of habeas corpus on behalf of a state prisoner unless the prisoner previously presented the same claim to the state courts that he currently presents in federal court. *Cullen v. Pinholster*, 563 U.S. 170, 182 (2011); *Kelly v. Lazaroff*, 846 F.3d 819, 828 (6th Cir. 2017) (quoting *Wagner v. Smith*, 581 F.3d 410, 417 (6th Cir. 2009)) (federal claim is exhausted if it was presented "under the same theory" in state court). A habeas petition is thus fully exhausted if each and every claim was first fairly presented to the state appellate court[1] as a federal constitutional claim in substance, if not explicitly. *See Gray v. Netherland*, 518 U.S. 152, 162–63 (1996); *Pillette v. Foltz*, 824 F.2d 494, 496 (6th Cir. 1987) (requiring the presentation of "the legal and factual substance of every claim to all levels of state court review").

However, because the exhaustion requirement "refers only to remedies still available at the time of the federal petition," it may also be "satisfied if it is clear that [the habeas petitioner's] claims are now procedurally barred under [state] law." *Gray*, 518 U.S. at 161 (citations and internal quotation marks omitted). The doctrine of procedural default is thus a corollary to the rule of exhaustion, one which ordinarily bars habeas review of claims that were not "fairly presented" for merits review in state court, either because they were presented in a way that failed to comport with state procedural rules or because they were not presented at all and no longer can be presented under state law. *O'Sullivan v. Boerckel*, 526 U.S. 838, 848 (1999) (acknowledging "the interplay of these two doctrines" and stating that, to avoid an end-run around the exhaustion requirement and "the values that it serves," "we ask not only whether a prisoner has exhausted his state remedies, but also whether he has *properly* exhausted those remedies, i.e., whether he has fairly

---

[1] In Tennessee, the Court of Criminal Appeals is the highest appellate court to which appeal must be taken in order to properly exhaust a claim. *See* Tenn. Sup. Ct. R. 39; *Adams v. Holland*, 330 F.3d 398, 402–03 (6th Cir. 2003).

presented his claims to the state courts") (emphasis in original; internal citations and quotation marks omitted). If the state court decides a claim on "adequate and independent state grounds"—typically a procedural rule prohibiting the state court from reaching the merits of the constitutional claim—the claim will ordinarily be barred from federal habeas review because of its procedural default. *Wainwright v. Sykes*, 433 U.S. 72, 81–82 (1977*); see also Walker v. Martin*, 562 U.S. 307, 315 (2011) ("A federal habeas court will not review a claim rejected by a state court if the decision of the state court rests on a state law ground that is independent of the federal question and adequate to support the judgment."); *Coleman v. Thompson*, 501 U.S. 722 (1991) (same). Likewise, if a claim has never been presented to the state courts, but a state-court remedy is no longer available (e.g., when an applicable statute of limitations bars a claim or state law deems the claim waived),[2] then the claim is technically (though not properly) exhausted but barred by procedural default. *Coleman*, 501 U.S. at 731–32.

If a claim is procedurally defaulted, "federal habeas review of the claim is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." *Id.* at 750. The burden of showing cause and prejudice to excuse defaulted claims is on the habeas petitioner. *Lucas v. O'Dea*, 179 F.3d 412, 418 (6th Cir. 1999) (citing *Coleman*, 501 U.S. at 754).

---

[2] The Tennessee Post-Conviction Procedure Act provides that "[i]n no event may more than one (1) petition for post-conviction relief be filed attacking a single judgment," and establishes a one-year statute of limitations for filing that one petition. Tenn. Code Ann. § 40-30-102(a) and (c). The Act further provides that "[a] ground for relief is waived if the petitioner personally or through an attorney failed to present it for determination in any proceeding before a court of competent jurisdiction in which the ground could have been presented," unless that ground could not be presented due to unconstitutional state action, or is based on a new and retroactive constitutional right that was not recognized at the time of trial. *Id.* § 40-30-106(g).

"Cause" for these purposes "must be something *external* to the petitioner, something that cannot fairly be attributed to him[,] . . . some objective factor external to the defense [that] impeded . . . efforts to comply with the State's procedural rule." *Coleman*, 501 U.S. at 753 (emphasis in original). Examples of cause include the unavailability of the factual or legal basis for a claim, interference by officials that makes compliance "impracticable," or attorney error that violates the right to counsel's effective assistance. *Id.* at 753–54. To establish prejudice, a petitioner must demonstrate that the constitutional error asserted in his defaulted claim "worked to his actual and substantial disadvantage." *Perkins v. LeCureux*, 58 F.3d 214, 219 (6th Cir. 1995) (quoting *United States v. Frady*, 456 U.S. 152, 170 (1982)); *see also Ambrose v. Booker*, 684 F.3d 638, 649 (6th Cir. 2012) (finding that "having shown cause, petitioners must show actual prejudice to excuse their default"). "When a petitioner fails to establish cause to excuse a procedural default, a court does not need to address the issue of prejudice." *Simpson v. Jones*, 238 F.3d 399, 409 (6th Cir. 2000). Likewise, if a petitioner cannot establish prejudice, the question of cause is immaterial.

Because the cause-and-prejudice standard is not a perfect safeguard against fundamental miscarriages of justice, the United States Supreme Court has recognized a "narrow exception" to the bar of an unexcused default in cases where a constitutional violation has "probably resulted" in the conviction of one who is "actually innocent" of the substantive offense. *Dretke v. Haley*, 541 U.S. 386, 392–93 (2004) (citing *Murray v. Carrier*, 477 U.S. 478, 495–96 (1986)); *accord Lundgren v. Mitchell*, 440 F.3d 754, 764 (6th Cir. 2006). To obtain habeas review under this narrow exception to the procedural-default rule, the petitioner must demonstrate his factual innocence, not the mere legal insufficiency of the State's proof; a miscarriage-of-justice claim is not supported by an assertion of mere legal innocence. *Lee v. Brunsman*, 474 F. App'x 439, 442

(6th Cir. 2012) (citing *Bousley v. United States*, 523 U.S. 614, 623 (1998), and *Calderon v. Thompson*, 523 U.S. 538, 559 (1998)).

B. <u>Review of the Petition</u>

1. <u>Denial of Rule 412 motion</u>

Petitioner claims that the trial court's exclusion of evidence of L.C.'s prior sexual behavior deprived him of his right to confront L.C. and relatedly deprived the jury of the ability to assess her credibility adequately.[3] The Sixth Amendment guarantees the right of a criminal defendant in a state or federal prosecution "to be confronted with the witnesses against him." U.S. Const. amend. VI; *see also Pointer v. Texas*, 380 U.S. 400, 407 (1965). "Cross-examination is a 'primary interest' secured by the Confrontation Clause; indeed, it 'is the principal means by which the believability of a witness and the truth of his testimony are tested.'" *Wiecek v. Lafler*, 417 F. App'x 443, 447 (6th Cir. 2011) (quoting *Davis v. Alaska*, 415 U.S. 308, 315–16 (1974)). Still, "the Supreme Court has likewise stated that a criminal defendant's confrontation rights are not limitless; rather 'trial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, . . . or interrogation that is repetitive or only

---

[3] In addition to claiming that the exclusionary ruling "resulted in a decision that was contrary to the [C]onfrontation [C]lause of the United States Constitution," Petitioner asserts that the exclusion of this evidence "involved an unreasonable application of Federal Rule of Evidence 412." (Doc. No. 1-1 at 5.) Respondent argues that this component of the claim is procedurally defaulted because Petitioner did not raise it before the state courts and is now precluded from doing so. Respondent further argues that Petitioner cannot show prejudice excusing the procedural default, "because the 'Federal Rules of Evidence do not apply to state criminal proceedings.'" (Doc. No. 14 at 23 (quoting *Wilson v. Sheldon*, 874 F.3d 470, 477 (6th Cir. 2017)).) It is simpler to say that, regardless of whether or not the default is excusable, the claim that Federal Rule 412 was unreasonably applied is not cognizable because the Federal Rules of Evidence do not apply to state criminal proceedings. *See Johnson v. Warden, Broad River Corr. Inst.*, No. CV 0:22-3210-CMC, 2023 WL 4196935, at *2 (D.S.C. June 27, 2023) ("Petitioner's objection … relies on a Federal Rule of Evidence that would not have been utilized in his state court criminal proceedings. Petitioner attempts to rely on this Rule in order to make this ground cognizable in a federal habeas petition; however, his argument is to no avail. Ground 1 cannot be remedied in a federal proceeding and is thus dismissed.").

marginally relevant.'" *Id.* (quoting *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986)). This latitude is all the wider when "it is merely the extent of cross-examination" on a relevant subject, rather than the ability to cross-examine on the subject at all, that is limited: "[o]nce cross examination reveals sufficient information to appraise the witnesses' veracity, confrontation demands are satisfied." *Dorsey v. Parke*, 872 F.2d 163, 167 (6th Cir. 1989) (quoting *United States v. Falsia*, 724 F.2d 1339, 1343 (9th Cir. 1983)).

Petitioner exhausted this Confrontation Clause claim before the TCCA (*see* Doc. No. 12-9 at 19–20 (asserting claim grounded in the due process right to present a defense "through cross-examination" and the "6th Amendment right to confront one's accusers")), which discussed the excluded evidence at length, *see State v. Russell*, 2014 WL 1704953, at *13–18, including by reference to "[t]he right to present witnesses" favorable to the defense.[4] *Id.* at *13–14 (relying on *Chambers v. Mississippi*, 410 U.S. 284, 295 (1973), wherein the Supreme Court applied "[t]he right of cross-examination [which] is ... implicit in the constitutional right of confrontation."). The TCCA first set out the applicable language of TRE 412, the rule that incorporates the Tennessee "rape shield law" and establishes guardrails for "the admissibility of evidence about a sex crime victim's prior sexual acts." *State v. Russell*, 2014 WL 1704953, at *13 (quoting TRE 412(c)). The TCCA noted that TRE 412 "is a rule of relevance," *id.* (citing *State v. Brown*, 29 S.W.3d 427, 430 (Tenn. 2000)), and that, even if the proffered evidence would otherwise be admissible under TRE

---

[4] "[C]onfrontation claims and right-to-present-a-defense claims are not doctrinally identical," but they "are closely related." *Martin v. Haas*, 731 F. App'x 443, 452 (6th Cir. 2018) (citing *Crane v. Kentucky*, 476 U.S. 683, 690 (1986) ("Whether rooted directly in the Due Process Clause of the Fourteenth Amendment, or in the Compulsory Process or Confrontation clauses of the Sixth Amendment, the Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense.'")). Where, as here, the federal habeas claim presents "one common and overarching question—whether there was constitutional error, cognizable under AEDPA, in precluding the disputed evidence"—the claim may be analyzed without parsing the right to confront and cross-examine adverse witnesses, the right to call witnesses in one's defense, and the due process right to present a defense. *Id.*

412(c), "the trial court must nevertheless conclude that the probative value of the evidence outweighs its unfair prejudice to the victim." *Id.* (citing TRE 412(d)(4)). The TCCA then described how this law overlaps with the right of the accused to present witnesses: "Although '[t]he right to present witnesses is of critical importance ... it is not absolute. In appropriate cases, the right must yield to other legitimate interests in the criminal trial process.' Specifically, '[i]n the exercise of this right, the accused, as is required of the State, must comply with established rules of procedure and evidence designed to assure both fairness and reliability in the ascertainment of guilt and innocence.'" *Id.* (quoting *Brown*, 29 S.W.3d at 432 and *Chambers v. Mississippi*, 410 U.S. 284, 295 (1973)).

The TCCA then discussed the testimony presented at the TRE 412 hearing and the trial court's denial of Petitioner's motion for a finding of admissibility. The TCCA noted that the trial court had recounted the purposes for which the evidence was offered—"to challenge [C.L.'s] credibility and prior sexual knowledge"—and determined that "the probative value of the evidence does not outweigh its unfair prejudice to C.L.," so "the evidence of prior sexual abuse and sexual encounters [is] not admissible." *Id.* at *16–17. The trial court particularly noted that the evidence of such activity "took place several years before the alleged incident" that gave rise to Petitioner's charges. *Id.* at *17. The TCCA's analysis continued:

> Later on, during trial, Defendant sought to admit testimony by C.L.'s foster mother that C.L., on one occasion, walked into a room in front of Defendant wearing "a spaghetti strap type little nightgown and her breasts were exposed at the top." She then attempted to approach Defendant and give him a hug. C.L.'s foster mother also testified that on another occasion, C.L. "had on some pants that I told her several times not to wear anymore where her butt was kind of hanging out and she bent over [near Defendant]." The trial court excluded the testimony finding that it was "getting into some 412 issues."
>
> We hold that the trial court committed no error in excluding the evidence that Defendant sought to admit. As pointed out by the State, none of the instances of sexual behavior reported by the witnesses resemble the allegation by Defendant

that C.L. performed oral sex on him. Nor does it resemble the acts of fellatio as alleged by C.L. C.L.'s provocative nature of wearing clothing and her behavior with other children several years before the present offenses is not relevant to the issue of Defendant's guilt or innocence in raping C.L. *See State v. Douglass Leon Lyle*, No. E2012–00468–CCA–R3–CD, 2013 WL 1281857 (Tenn. Crim. App. Mar. 28, 2013). Defendant is not entitled to relief on this issue.

*Id.*

"When a state court rejects a federal claim without expressly addressing that claim," it is presumed—"subject to rebuttal"—"that the federal claim was adjudicated on the merits." *Martin*, 731 F. App'x at 451 (quoting *Johnson v. Williams*, 568 U.S. 289, 301 (2013)). This presumption may be rebutted where the federal claim was rejected "as a result of sheer inadvertence." *Johnson*, 568 U.S. at 303. Here, the TCCA's decision did not expressly reckon with Petitioner's rights under the Due Process Clause or any clause of the Sixth Amendment. However, the TCCA at least implicitly recognized that such rights were at stake, given that it quoted *Chambers* for the proposition that the right of the accused to present the testimony of witnesses in his defense is subject to limits imposed by established rules of evidence; at the least, Petitioner's federal claim was not inadvertently rejected when the TCCA proceeded to decide "that the trial court committed no error in excluding the evidence that [Petitioner] sought to admit." *State v. Russell*, 2014 WL 1704953, at *17. That decision is not contrary to federal law, and Petitioner would not be entitled to relief even if the decision had inadvertently disposed of his federal claim. Errors in a state court's "rulings regarding the admission or exclusion of evidence" are generally not cognizable in federal habeas corpus, except "in certain, limited circumstances, such as when an evidentiary ruling is so egregious that it results in a denial of fundamental fairness" and may violate due process. *Sandoval v. Toledo Corr. Inst.*, 409 F. App'x 847, 850 (6th Cir. 2010) (quoting *Coleman v. Mitchell*, 244 F.3d 533, 542 (6th Cir. 2001) and *Bugh v. Mitchell*, 329 F.3d 496, 512 (6th Cir. 2003)) (internal quotation marks omitted). In the particular context of a Confrontation Clause challenge to evidence

excluded under a rape shield law, the Sixth Circuit "has consistently held that rape shield laws that exclude irrelevant evidence do not violate a criminal defendant's right of confrontation." *Gordon v. Morgan*, 27 F. App'x 528, 530 (6th Cir. 2001) (citing cases). In *Gordon*, the Sixth Circuit determined that evidence of the minor victim's sexual abuse "years earlier" and of her present sexual activity was offered to attack the victim's credibility but "was not material or relevant to the issue of whether Gordon raped the eleven-year-old girl" on the day in question, so "the exclusion of the evidence did not give rise to a constitutional error." *Id.* This analysis squarely applies in the case at bar, where the TCCA found that the excluded evidence of C.L.'s behavior "several years" prior to the acts for which Petitioner was charged, and of times when she was provocatively dressed, "is not relevant to the issue of [his] guilt or innocence in raping C.L." *State v. Russell*, 2014 WL 1704953, at *17.

Petitioner cites *Olden v. Kentucky*, 488 U.S. 227 (1988), as requiring that he be allowed to cross-examine C.L. on the excluded topics, given that (according to Petitioner) her credibility was the sole determinant of the issue of his guilt or innocence of the charged crimes and that the ability to cross-examine her about prior sexual acts had "such strong potential to demonstrate the falsity of [the victim's] testimony." (Doc. No. 1-1 at 6 (quoting *Olden*, 488 U.S. at 232).) But the facts in Petitioner's case are not analogous to the facts in *Olden*. In that case, Olden's theory of defense to the charge of rape was that the alleged victim, Mathews, falsely claimed that their consensual sexual encounter was nonconsensual in order to protect her relationship with another lover, Russell, who was in an extramarital relationship with Mathews and who had seen Mathews emerging from the car where Olden was also a passenger. By the time of trial, Mathews and Russell had separated from their respective spouses and were living together. "In order to demonstrate Matthews' motive to lie, it was crucial, [Olden] contended, that he be allowed to introduce

evidence of Matthews' and Russell's current cohabitation," but the trial court excluded that evidence *despite its relevance to Mathews' motive*, on grounds that Matthews and Russell were different races and testimony about their interracial cohabitation "may have created extreme prejudice against Matthews." *Olden*, 488 U.S. at 230–31. The state appellate court affirmed, but the U.S. Supreme Court reversed, finding that while "reasonable limits on defense counsel's inquiry into the potential bias of a prosecution witness" may be appropriate, "the limitation here was beyond reason. Speculation as to the effect of jurors' racial biases cannot justify exclusion of cross-examination with such strong potential to demonstrate the falsity of Matthews' testimony." *Id.* at 232.

In the case at bar, Petitioner's theory of defense at trial against the charges of rape was that C.L. instigated the sexual act that occurred between them on the night of February 22–23, 2007, when Petitioner was not fully awake, and that her allegations of other sexual encounters were untrue. The proof adduced at the TRE 412 hearing was offered as evidence of C.L.'s general lack of credibility and her knowledge of (as opposed to naivete concerning) sexual matters, <u>not</u> as evidence of C.L.'s motive for falsely accusing Petitioner concerning the particular occasions that generated rape charges. *Cf. Hart v. Lafler*, No. CIV. 06-11796, 2008 WL 2622837, at *10 (E.D. Mich. June 30, 2008) ("The trial court's exclusion of the rape-shield evidence did not compromise petitioner's Confrontation Clause rights because he sought to introduce the evidence as a general attack on the victim's credibility, rather than as a particularized attack demonstrating bias or motivation to testify against petitioner.") (relying on, *inter alia*, *Davis v. Alaska*, 415 U.S. 308, 316 (1974) (distinguishing between cross-examination that allows an inference "that the witness' character is such that he would be less likely than the average trustworthy citizen to be truthful in his testimony," and cross-examination that constitutes "[a] more particular attack on the witness'

credibility" because it is "directed toward revealing possible biases, prejudices, or ulterior motives of the witness as they may relate directly to issues or personalities in the case at hand," and recognizing that the latter represents "a proper and important function of the constitutionally protected right of cross-examination")). The TCCA's conclusion—that the TRE 412 evidence (1) did not refer to either party's version of events surrounding the charged rapes or the manner of their perpetration (via oral sex), (2) was not timely vis-à-vis the charged rapes, and thus (3) was simply irrelevant to the issue of Petitioner's guilt or innocence of the charges of raping C.L.—was not contrary to, nor did it involve an unreasonable application of, federal law that was clearly established (in *Olden* or otherwise), particularly in light of the fact that Petitioner was not deprived entirely of "the opportunity to challenge the victim's credibility, despite the suppression of the rape-shield evidence." *Hart*, 2008 WL 2622837, at *10.

Indeed, after taking advantage of the opportunity to raise credibility concerns via cross-examination of C.L. and of the other prosecution witnesses,[5] Petitioner put on two witnesses of his own for purposes of establishing C.L.'s lack of credibility: Takiyah Cooper (a jail officer who had previously dated Petitioner and came to know C.L. over the recent period of time when C.L. was incarcerated in Cooper's unit) and Patricia Terrell (a guidance counselor at the middle school C.L. attended). (*See* Doc. No. 12-5 at 139–154; Doc. No. 12-6 at 5.) Petitioner's right to confront the witnesses against him and to present a defense was thus preserved, and ample evidence from which

---

[5] *See, e.g.*, Doc. No. 12-5 at 7 (foster mother's testimony that C.L. "had a problem with lying, fabricating stories, and . . . a lot of emotional and attachment issues"), 113–122, 127–130 (Detective Zoccola's testimony establishing that C.L. had to be prompted "to tell the complete truth," following which she reported, for the first time, incidents of sexual abuse that occurred on dates other than February 23, 2007).

the jury could have found C.L. not to be credible was presented from the witness stand.[6] The jury simply did not accept that evidence. This habeas claim is without merit.

## 2. Ineffective assistance of counsel

The Sixth Amendment to the U.S. Constitution "guarantees that 'at trial and on direct . . . appeal every criminal defendant will have access to a lawyer to assist with his or her defense,'" and that the lawyer's assistance will be effective. *Muniz v. Smith*, 647 F.3d 619, 622 (6th Cir. 2011) (quoting *Nichols v. United States*, 563 F.3d 240, 248 (6th Cir. 2009)). Claims of ineffective assistance are properly analyzed under the two-prong standard of *Strickland v. Washington*, 466 U.S. 668 (1984), which asks: (1) whether counsel was deficient in representing the petitioner; and (2) whether counsel's alleged deficiency prejudiced the defense so as to deprive the petitioner of a fair trial. *Id.* at 687. To meet the first prong, the petitioner must establish that his attorney's representation "fell below an objective standard of reasonableness," and must overcome the "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, [he] must overcome the presumption that . . . the challenged action 'might be considered sound trial strategy.'" *Id.* at 688–89 (quoting *Michel v. State of La.*, 350 U.S. 91, 101 (1955)). The "prejudice" component of the claim "focuses on the question of whether counsel's deficient performance renders the result of the . . . proceeding fundamentally unfair." *Lockhart v. Fretwell*, 506 U.S. 364, 372 (1993). It requires a showing that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*

---

[6] In his Reply, Petitioner asserts that the testimony bearing on C.L.'s credibility "did not take place at trial, but at the 412 hearing, out of the presence of the jury," and that Respondent's assertion to the contrary is "blatantly false." (Doc. No. 16 at 3.) Petitioner is mistaken. The transcripts confirm that testimony bearing on C.L.'s credibility was offered at trial, before the jury.

Petitioner asserts four claims of his counsel's ineffectiveness at trial, and one claim of counsel's ineffectiveness on appeal. Respondent argues that four of these five ineffective-assistance claims are procedurally defaulted because they were not raised before the TCCA and cannot now be pursued under the Tennessee Post-Conviction Act. Respondent also contends that the default should not be excused. Petitioner acknowledges the default but argues that the default should be excused because "they are indeed substantial [claims], and deserving of relief." (Doc. No. 1-1 at 10–11.) The Court considers each claim in turn.

a. <u>Counsel's representation in proceedings under TRE 412</u>

Petitioner claims that counsel's "argument of consent undermined his client[']s claim of innocence and tainted the 412 hearing," inasmuch as Petitioner had insisted that "two of the incidents were fabricated by the alleged victim" and the third incident "was initiated by the alleged victim without [Petitioner's] consent," so the defense of C.L.'s consent to the acts charged as rape was not properly at issue in the case. (Doc. No. 1-1 at 11–12.) According to Petitioner, "the Tennessee Court of Criminal Appeals affirmed [the TRE 412 ruling], giv[ing] great consideration to the defense's theory of consent in making their ruling." (*Id.* at 11.) Therefore, "counsel's argument of consent at the 412 hearing constitutes deficient performance[.]" (*Id.*)

Regardless of exhaustion,[7] this claim must be dismissed because it plainly lacks merit. *See* 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits,

---

[7] Respondent asserts that this claim was "raised and litigated" in the post-conviction trial court but not on post-conviction appeal, meaning (according to Respondent) that post-conviction trial counsel's ineffectiveness cannot be the cause of its default. (Doc. No. 14 at 27.) It is not clear to the Court that the claim presented here was raised before the post-conviction trial court. In the post-conviction petition, Petitioner claimed that "Trial Counsel failed to establish an appropriate record so that the appellate courts could make a proper ruling as to the admissibility of 412 evidence in relation to statutory rape by an authority figure." (Doc. No. 12-15 at 77.) The claim he pressed in the post-conviction trial court appears to be that because of this lack of "an appropriate record," counsel was not able to make "[t]he appropriate argument" to the TCCA on direct appeal, which is that the TRE 412 evidence "was relevant because the [Petitioner] maintained he was unaware that it was the victim that he was engaging with sexually as he was

notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State."). Petitioner's assertions do not stand up to scrutiny. Pretrial counsel did not argue for the admission of any evidence going to the issue of C.L.'s consent at the TRE 412 hearing (*see* Doc. No. 12-1 at 38–39, 50–65; Doc. No. 12-3 at 71–77), nor did the TCCA give more than passing consideration to that issue when reviewing the trial court's exclusion of the TRE 412 evidence. It is true that counsel argued before the TCCA that evidence of C.L.'s promiscuity should have been admitted as it would have enabled the jury "to assess [C.L.'s] 'sexual behavior' towards 'the accused' when the primary issue was [her] consent" to any encounter that occurred between them. (Doc. No. 12-9 at 22.) But in no way could this appellate argument have "tainted the 412 hearing." (Doc. No. 1-1 at 11.) Nor could any trial argument for a finding of consent have constituted deficient performance (even if it did not square precisely with Petitioner's claim that he was innocent of all charges), given that the three rape charges against Petitioner included lack of consent as an element of the indicted offense. (*See* Doc. No. 12-1 at 5, 7, 9); Tenn. Code Ann. § 39-13-503(a)(2).

For its part, the TCCA made quick work of counsel's appellate argument, stating that "[e]vidence of consent as proven by C.L.'s sexual history would be irrelevant," as "consent is not a defense to statutory rape," and the TRE 412 testimony had "already [been] determined" to be irrelevant "to the issue of [Petitioner's] guilt or innocence in raping C.L.," without reference to any consent defense. *State v. Russell*, 2014 WL 1704953, at *18. Clearly, Petitioner did not receive ineffective assistance of counsel on this issue. This claim has no merit.

mostly asleep." (*Id.* at 78.) Again, it is not clear that this presentation to the post-conviction trial court encompasses the precise contours of the claim made on habeas review in this Court.

b. <u>Counsel's failure to assert speedy trial rights</u>

Petitioner claims that his counsel during pretrial proceedings, Karl Pulley was ineffective in failing to assert Petitioner's Sixth Amendment right to a speedy trial. (Doc. No. 1-1 at 12–15.) As Respondent points out, this claim was litigated and decided against Petitioner in the post-conviction trial court. (*See* Doc. No. 12-15 at 65, 75–76, 85–87.) Petitioner defaulted the claim by failing to raise it on post-conviction appeal.

Because "[t]here is no constitutional right to an attorney in state post-conviction proceedings," *Coleman*, 501 U.S. at 752, petitioners "bear the risk of attorney error that results in a procedural default" during such proceedings, *id.* at 752–53, with one exception: "Inadequate assistance of counsel *at initial-review collateral proceedings* may establish cause for a prisoner's procedural default of a claim of ineffective assistance at trial." *Martinez v. Ryan*, 566 U.S. 1, 9 (2012) (emphasis added). Petitioner in the case at bar invokes the *Martinez* exception to excuse the default of his claims of trial counsel's ineffectiveness. (*See* Doc. No. 1-1 at 7–11.)

However, the *Martinez* exception is inapplicable to Petitioner's defaulted claim related to the assertion of his speedy trial rights because that ineffective-assistance claim was not defaulted "at initial-review collateral proceedings," but on *appeal from the denial* of post-conviction relief. *See Atkins v. Holloway*, 792 F.3d 654, 661 (6th Cir. 2015) (holding that "a claim of ineffective assistance of state appellate collateral counsel does not provide cause to excuse the procedural default of the claims [petitioner] raised below during initial collateral proceeding" and that although failure to appeal denied claims "may have been the product of attorney error, attorney error at state post-conviction appellate proceedings cannot excuse procedural default" under *Martinez*) (quoting *West v. Carpenter*, 790 F.3d 693, 699 (6th Cir. 2015)). Petitioner makes no

other effort to show cause excusing the default. He is therefore not entitled to relief on the merits of this ineffective-assistance claim.

c. <u>Counsel's failure to negotiate a plea agreement</u>

Petitioner claims that trial counsel performed deficiently during plea negotiations, in that a favorable plea offer was rescinded after Petitioner told counsel to accept it and that counsel nor the State made any further attempt to negotiate a plea. (Doc. No. 1-1 at 16.) This claim was exhausted before the TCCA on post-conviction appeal.

Where an exhausted claim of ineffective assistance of counsel is raised in a federal habeas petition, review under AEDPA is "doubly deferential," *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009), in that "*Strickland* requires deference to counsel and AEDPA requires deference to the state court." *Moody v. Parris*, No. 20-5299, 2022 WL 3788503, at *4 (6th Cir. Aug. 30, 2022). The question on habeas review, then, is not whether the petitioner's counsel was ineffective (a question that is answered based in part of substantial deference to trial counsel's strategic decisions), but "whether the state court's application of the *Strickland* standard was unreasonable" (a question that is answered based in part of substantial deference to the state court). *Harrington v. Richter*, 562 U.S. 86, 101 (2011).

In this case, the TCCA analyzed the plea negotiation issue under *Strickland*. *See Russell v. State*, 2022 WL 2277160, at *3. The TCCA began by noting that the post-conviction trial court "implicitly accredited counsel's testimony that he had 'communicated with [the] petitioner regarding his initial plea offer, but [the] petitioner was not interested at the time. There were no further successful plea negotiations made to discuss with [the] petitioner.' The court further found that the petitioner had failed to demonstrate any prejudice flowing from his counsel's 'allegedly deficient conduct.'" *Id.* The TCCA then noted that Petitioner had "the burden of proving his . . .

factual allegations by clear and convincing evidence," citing Tenn. Code Ann. § 40-30-110(f), and that it would "accord[] to the post-conviction court's findings of fact the weight of a jury verdict," such that "these findings are conclusive on appeal unless the evidence preponderates against them." *Id.* The TCCA's analysis concluded as follows:

> The petitioner is not entitled to relief. The record establishes that the State made an offer that the petitioner did not immediately accept. At some point close in time to the petitioner's trial, the petitioner asked trial counsel to approach the State about his accepting the previous offer. At that point, the prosecutor rescinded the offer on grounds that the offer included an illegal sentence. No further negotiations took place because the petitioner had not asked trial counsel to make a specific counter offer. Additionally, trial counsel indicated that, in his experience, the prosecutor involved in the petitioner's case would not have made a lower offer, and the petitioner would not have accepted a higher offer. The State is under no obligation to enter into plea negotiations, *see State v. Head*, 971 S.W.2d 49, 50 (Tenn. Crim. App. 1997) (citations omitted), and counsel cannot be faulted for the State's unwillingness to engage in such negotiations, *see Shanda Alene Wright v. State*, No. M2010-00613-CCA-R3-PC, slip op. at 6 (Tenn. Crim. App., Nashville, Apr. 8, 2011) (citing *Head*, 971 S.W.2d at 50).

*Id.*

This analysis of counsel's representation at the plea stage is reasonable. Petitioner argues that the State's original plea offer was not 'rescinded' due to a lack of desire to negotiate," but because "they were unable to go forward with the original plea because the sentence itself was illegal." (Doc. No. 16 at 3.) Therefore, he argues, had counsel further attempted to negotiate—as he should have even without Petitioner asking him to make a specific counteroffer (*see* Doc. No. 1-1 at 17)—"it is likely a plea would have been reached as both the Prosecutor and the Petitioner were open to it." (Doc. No. 16 at 3–4.) However, in addition to being speculative, this conclusion is contradicted by the TCCA's findings that the prospect of a plea bargain had been reopened (at Petitioner's request) only "close in time to [his] trial," when an offer of a particular state sentence

was withdrawn because of "the fact that the petitioner was serving a federal sentence."[8] *Russell v. State*, 2022 WL 2277160, at *2, 3. The TCCA affirmed the trial court's implicit accreditation of trial counsel's testimony that, under those circumstances, the State would not have made a lower offer and was unwilling to continue plea negotiations. Accordingly, the inability to negotiate a plea agreement was found not to be counsel's fault, *id.* at *3, that is, not to have resulted from any deficient performance on counsel's part. Moreover, the TCCA's decision makes clear that Petitioner failed to show prejudice by demonstrating any reasonable probability that but for counsel's poor performance, he would have received an acceptable plea offer. *See Byrd v. Skipper*, 940 F.3d 248, 257 (6th Cir. 2019) ("[B]ecause there is no right to a plea offer, where a petitioner alleges ineffective assistance of counsel prevented plea negotiations, demonstrating prejudice requires that he establish a reasonable probability that but for counsel's errors, the petitioner would have received a plea offer" and "would have accepted the offer, the prosecution would not have rescinded the offer, and . . . the trial court would not have rejected the plea agreement.").

In sum, the TCCA's application of *Strickland* to this claim was reasonable, and this Court must defer to it. Accordingly, the claim is without merit.

d. <u>Appellate counsel's failure to challenge the sufficiency of the evidence of rape</u>

Petitioner claims that appellate counsel was ineffective in challenging the sufficiency of the evidence only on the counts of statutory rape by an authority figure, when he should also have

---

[8] This Court takes judicial notice of the docket of Petitioner's federal criminal case in the Western District of Texas, which reflects his March 2010 sentence of 120 months in prison (which he completed on March 15, 2018) followed by 5 years of supervised release. *USA v. Russell*, No. 5:08-cr-00469-OLG, Doc. Nos. 53, 81 (W.D. Tex.); *see also* Federal Bureau of Prisons website, https://www.bop.gov/inmateloc/, reflecting that Henry Wayne Russell, Register Number 18796-075, was "Not in BOP Custody as of: 03/15/2018." The Court may take judicial notice of "public records and government documents available from reliable sources on the Internet," *ARJN #3 v. Cooper*, 517 F. Supp. 3d 732, 747 (M.D. Tenn. 2021), including "entries from its docket or another court's docket." *Overton v. Tennessee*, 590 F. Supp. 3d 1087, 1089 n.1 (M.D. Tenn. 2022); *see also Lynch v. Leis*, 382 F.3d 642, 647 n.5 (6th Cir. 2004) (noting that judicial notice is properly taken of "court records [that] are available online to members of the public") (citation omitted).

challenged the sufficiency of the evidence on the counts of rape. In particular, he claims that the latter challenge should have been made because the evidence that C.L. did not consent to the charged sexual activity is insufficient. (Doc. No. 1-1 at 20–21.) This claim was not exhausted through appeal to the TCCA during post-conviction review. It is therefore procedurally defaulted.

Petitioner's only attempt to show cause excusing the default is his citation to *Martinez* and to post-conviction trial counsel's alleged ineffectiveness. (Doc. No. 1-1 at 7–11.) But *Martinez* cannot save a defaulted claim that counsel on direct appeal was ineffective. Rather, the *Martinez* exception to *Coleman*'s rule that petitioners "bear the risk of attorney error that results in a procedural default" during post-conviction proceedings, 501 U.S. at 752–53, is a "narrow" one that applies only to redeem a defaulted claim of ineffective assistance during the initial trial. *Martinez*, 566 U.S. at 9. Accordingly, even if Petitioner's attorney at the initial level of post-conviction review was ineffective in failing to raise this claim, *Martinez* cannot be invoked to excuse the default because the defaulted claim does not assert trial counsel's ineffectiveness. *See Davila v. Davis*, 582 U.S. 521, 529 (2017) ("Petitioner asks us to extend *Martinez* to allow a federal court to hear a substantial, but procedurally defaulted, claim of ineffective assistance of appellate counsel when a prisoner's state postconviction counsel provides ineffective assistance by failing to raise that claim. We decline to do so."). Petitioner is therefore not entitled to relief on the merits of this ineffective-assistance claim.

### 5. Counsel's failure to renew the TRE 412 motion during trial

Petitioner claims that he was denied the effective assistance of trial counsel when, at some point "during trial," the prosecution (supposedly) opened the door to the previously excluded topics of C.L.'s prior sexual knowledge and consent by "present[ing] evidence that the alleged victim had learn[ed] sexual positions f[ro]m the Petitioner," and that despite (supposedly) having

the door thus opened, trial counsel "fail[ed] to object and renew the 412 motion" to admit evidence of C.L.'s promiscuity, so as to attack her credibility. (*See* Doc. No. 1-1 at 23.) This claim is procedurally defaulted; it was not raised before the TCCA. It was raised only in the post-conviction trial court, within the post-conviction petition itself, as a sub-claim under the heading "Trial Counsel failed to establish an appropriate record so that the appellate courts could make a proper ruling as to the admissibility of 412 evidence in relation to statutory rape by an authority figure." (Doc. No. 12-15 at 77–78.) Specifically, sub-paragraphs (3) and (4) under this heading state: "Defense Counsel failed to renew the 412 motion after the State deliberately elicited information that the victim learned the names of sexual positions at 15-16. (R25 12-15)," and "Defense Counsel failed to renew the 412 motion when the State opened the door to the relevance of consent. (R27, 20-25)." (Doc. No. 12-15 at 78.) These sub-claims were neither asserted at the evidentiary hearing nor referred to in the trial court's decision denying post-conviction relief, except to the extent that the latter denied the claim "that counsel failed to make appropriate objections at trial," including objecting to "open ended and vague questions regarding prior sexual encounters between petitioner and the victim." (*Id.* at 88.) But even if the Court were to find that these sub-claims were negligently developed after being properly raised, that negligent development would not justify a finding that the default was due to the *ineffectiveness of post-conviction trial counsel* in particular. *See Rogers v. Mays*, 69 F.4th 381, 396 (6th Cir. 2023) ("If post-conviction counsel negligently fails to develop the state-court record, that failure is attributed to the petitioner.") (citing *Shinn v. Ramirez*, 596 U.S. 366, 383–84 (2022)); *Hugueley v. Mays*, 964 F.3d 489, 500 (6th Cir. 2020) ("[P]ost-conviction counsel's failure to take all possible steps to fully develop a claim cannot be the 'cause' of a default as long as counsel properly raised the claim and made a good-faith effort in presenting it."). The default occurred on post-conviction appeal, so *Martinez* does not excuse

the default, *Atkins*, 792 F.3d at 661, and Petitioner cites no other basis for establishing cause. Accordingly, he is not entitled to review of the merits of this ineffective-assistance claim.

Alternatively, even if the Court were to find that the reason that this claim had not been properly raised by post-conviction counsel at the trial level was that post-conviction counsel was ineffective in failing to raise it, then for that ineffectiveness to qualify as cause for the default, the claim must be "substantial"—that is, it must "ha[ve] some merit" justifying its adjudication despite the default. *Id.* at 660 (quoting *Martinez*, 566 U.S. at 14). But the claim is not substantial. As presented in this Court, it is not supported by specific facts or citations to the state-court record. The only factual detail offered to support the claim of door-opening by the prosecution is that the prosecution "presented evidence that the alleged victim had learn[ed] sexual positions f[ro]m the Petitioner." (Doc. No. 1-1 at 23.)

Habeas Rule 2(c) requires more. Prior to the enactment of Rule 2(c), habeas petitions "frequently contained mere conclusions of law, unsupported by any facts," but "Rule 2(c) is more demanding." *Mayle v. Felix*, 545 U.S. 644, 655 (2005) (citation omitted). As has been previously recognized in this court,

> Habeas Corpus Rule 2(c) requires that a petition must "specify all the grounds for relief available to the petitioner" and "state the facts supporting each ground[.]" Habeas Corpus R. 2(c)(1), (2). This rule "deviates from the 'notice pleading' rules applicable in other federal civil cases" and "mandates that the petitioner at least summarily plead specific facts supporting each claim for relief." 1 Randy Hertz & James S. Liebman, Federal Habeas Corpus Practice & Procedure § 11.6 (7th ed. updated Dec. 2021). A habeas petition that "contain[s] mere conclusions of law, unsupported by any facts" is "obviously deficient" because "it is the relationship of the facts to the claim asserted that is important[.]" Habeas Corpus R. 2(c) advisory committee's note to 1976 adoption. A petitioner's failure to fulfill the pleading requirements of Habeas Rule 2(c) provides an appropriate basis for dismissal. *See*, *e.g.*, *Guerrero v. Ford*, No. 1:17-cv-00103, 2019 WL 330878, at *12 (M.D. Tenn. Jan. 25, 2019) (dismissing claim under Habeas Rule 2(c) where petitioner "d[id] not set forth any facts to support his allegation . . ."); *Creech v. Taylor*, Civ. Action No. 13-165, 2013 WL 6044359, at *2 (E.D. Ky. Nov. 14, 2013) (dismissing habeas petition containing only "[c]onclusory allegations with no accompanying

evidentiary support"); *Morris v. Motley*, No. 3:07-CV-P420-S, 2007 WL 3171538, at *1 (W.D. Ky. Oct. 26, 2007) (dismissing habeas petition lacking factual allegations or other specifics).

*Grimes v. Mays*, No. 3:19-CV-00585, 2022 WL 3582487, at *9 (M.D. Tenn. Aug. 19, 2022), *report and recommendation adopted*, 2022 WL 4097711 (M.D. Tenn. Sept. 7, 2022).

The liberal construction generally owed to pro se pleadings does not require this Court to scour the record in order to flesh out the bare bones of the Petition with supporting facts. *See id.* (citing *Adams v. Armontrout*, 897 F.2d 332, 333 (8th Cir. 1990), and *Mills v. Larose*, No. 1:13CV1059, 2015 WL 687829, at *11 (N.D. Ohio Feb. 18, 2015)); *see also Erwin v. Edwards*, 22 F. App'x 579, 580 (6th Cir. 2001) ("Liberal construction does not require a court to conjure allegations on a litigant's behalf[.]"). Even if the Court followed the citation contained in the state post-conviction petition, to transcript references "R25 12-15" and "R27, 20-25" (Doc. No. 12-15 at 78), those pages and lines of C.L.'s transcribed trial testimony (Doc. No. 12-4 at 29, 31) indicate that she learned the term for a sexual position when she was "about 15, 16" years old, and that she did not want to engage in any type of sexual activity with Petitioner on the evening of February 22–23, 2007, when she was still 14 years old. *See State v. Russell*, 2014 WL 1704953, at *1 ("From the evening of February 22, 2007, until the morning of February 23, 2007, C.L.'s foster mother left Defendant in charge of her two sons and C.L., who was fourteen at the time[.]"). The claim that counsel was ineffective in failing to object and to renew the motion to introduce proof of C.L.'s *prior* sexual knowledge learned from others, in response to the State's presentation of evidence that C.L. had learned a sexual position and its name as a result of (or in the aftermath of) Petitioner's conduct (*see* Doc. No. 1-1 at 23), is not substantial. This claim has no merit.

## VI. Conclusion

For the foregoing reasons, the Petition will be **DENIED** and this action will be **DISMISSED** with prejudice.

The Court must issue or deny a certificate of appealability ("COA") when it enters a final order adverse to a § 2254 petitioner. Rule 11, Rules Gov'g § 2254 Cases. A petitioner may not take an appeal unless a district or circuit judge issues a COA. 28 U.S.C. § 2253(c)(1); Fed. R. App. P. 22(b)(1). A COA may issue only if the petitioner "has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). A "substantial showing" is made when the petitioner demonstrates that "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003) (citations and internal quotation marks omitted). "[A] COA does not require a showing that the appeal will succeed," but courts should not issue a COA as a matter of course. *Id.* at 337.

Because reasonable jurists could not debate whether Petitioner's claims should have been resolved differently or are deserving of encouragement to proceed further, the Court will **DENY** a COA. Petitioner may seek a COA directly from the Sixth Circuit Court of Appeals. Rule 11(a), Rules Gov'g § 2254 Cases.

An appropriate order will enter.

*Eli Richardson*

ELI RICHARDSON
UNITED STATES DISTRICT JUDGE